Good morning. May it please the court. Sidney Tribe here on behalf of the appellant, Esperanza Diaz del Castillo. With the court's permission, again, I'd like to reserve four minutes for rebuttal, but I recognize that I am keeping track of my own time. I'll try to remind you. That's all right. Thank you. This is the second time this year I have had the privilege of appearing before this distinguished court. And unfortunately, this time, the refrain is much the same as the last. The district court has received. I wasn't there last time, so I didn't worry. I didn't hear it, so. And the outcome last time was as good as I hope this one will be. So the district court done wrong again. Exactly. By the refrain. Exactly. The district court has improperly weighed and balanced conflicting evidence in this Title VII case and has improperly ordered summary judgment in a case that should have been submitted to a jury. As this court has acknowledged time and again, to survive summary judgment on Title VII claims, plaintiffs are required to offer some evidence that would give rise to an inference of unlawful discrimination. Ms. Diaz del Castillo did so, and summary judgment in favor of DSHS should have been denied, and this case should have gone to trial. Let's take, if I could focus you on these claims separately. Absolutely. First, hostile environment. We know there's a lot of precedent about what's a hostile environment and what's insufficient for that. So why don't you tell us the best evidence that was submitted on that? And it is absolutely a very fact-based inquiry. The most specific evidence, again, to separate them out, although they're both important, there's a distinction between those hostile work environment aspects that were directly and explicitly racial and those that were hostile actions toward Ms. Diaz del Castillo, but perhaps were not explicitly racial. But we know it's a hostile environment. This isn't a civility code, and a lot of people would claim that their work environment's hostile, and maybe my staff would say that about me, but it still may not qualify as a hostile work environment. So given the facts, all facts that are most favorable inferences for your, give us some case law. Tell us what those facts are, your strongest argument, and then tell us some case that says that's enough. OK. A good example of a case that is applicable is McGinnis versus GTE. And now, you have to remember that in this case, there was quite a shorter amount of time for the hostile environment than McGinnis. But the specific kinds of hostility that were directed toward Ms. Diaz del Castillo were the subjection twice to her in class, to the entire class, in which she was the only Hispanic member, of the suggestion that Hispanic DSHS claimants could be properly redirected to jobs as taco makers. That was, I thought it was used in the context of an illustration of what you should not do in training the claims adjudicators. That was the assertion of DSHS, but that is a specific factual dispute that needs to be resolved. Her assertion was that that was a proper way to reassign a Hispanic claimant, or that Jewish claimants could be reassigned to classes as pickle makers. Again, I mean, this is a serious factual dispute for trial. And so she gets, no, I mean, the facts for hostile working, she gets, for summary judgment, she gets her set here. But that being said, I mean, there are instances where even over a long period of time, someone can use the N-word, which is horrible, but it still might not be a hostile work environment because it's a stray remark. Right, but that's not the only instance that we're talking about. OK, so she's the two taco makers, so they put her name down as Espy. Yes, that was, again, a factual dispute. Her feeling was that it was disrespectful, and that her full name should have been used. But did she use it in her office interaction emails? She did, again, and I mean, I'm not here to suggest that that's the most serious incident, or that that incident is somehow the best facts. OK, the taco maker remark, two, they're referring to her as asking her to translate her last name when no other trainee was asked to do that. Why would asking her to translate her last name be sufficiently severe and pervasive as to create a hostile work environment? Again, Your Honor, the standard is to look at the facts as a whole. And asking her to translate her name, and then when she translated it as meaning of the castle, ridiculing her as that she was royalty at the DSHS. There were ridicules of her using her Spanish language skills, ridicules of her accent. She was told not to speak, talk to people in Spanish. Yes. All right, that was another one she said. And also, she was criticized for her heavy accent. Yes, that's correct. Are those all of them? No, there was also quite a deal of hostile treatment from her supervisor and from her trainer in class. She was expelled from class one day, quite embarrassingly. Now, there is testimony in the record to suggest that she had said that she was ill. Oh, she said she was ill. She did say she was ill, but that doesn't necessarily justify a trainer in front of all of the other trainees. She went to the doctor, is that right? Yes. OK, and the doctor prescribed some medication. Right. So she was sick. But again, the factual dispute is not over whether or not she was ill. The factual dispute is over. The hostile work environment aspect of sending someone home when they say they're ill and they're going to a doctor. Yelling at her in front of the other trainees and telling her that they didn't want her germs and to get out. That was her explanation of the situation. I guess the question in my mind would be, how could a reasonable jury find that ordering a sick employee to leave the confines of a training classroom so that the employee didn't spread germs to the other employees constitute a hostile act? If you're, it depends on whether or not the question is a factual question of whether or not she was actually sick or a question of. I'm asking the question as a matter of law. Well, OK. How could that ever be? OK. Here's the distinction. The facts in the best light to your client. Exactly. In the lights most favorable to her. Her description also has, she subjectively felt that all of those were a certain way. But there's an objective standard that has to be superimposed on all of that. So you get your most favorable facts the way that she states them. But then objectively, how could that be a hostile work environment? With all of those together. Well, those are not all the facts that indicated a hostile work environment, however. You also have, particularly after, and I recognize that this somewhat overlaps with the retaliation claim, which I'll get to in a second. But particularly after she had made the complaint about the taco maker remark, suddenly she was getting constant and very negative evaluations, including personal remarks, kinds of remarks that were not included in her evaluations prior to that complaint. And essentially being told that she's on probation and that her job is in jeopardy. She's on probation, right? But again, you have to look at it in the course of the entire record as to whether or not she could. She's a probationary employee for six months, which by definition means you don't have permanent job security. Sorry, you're absolutely right. Evaluating your suitability for this job. You're absolutely right. I didn't mean to say probation. I meant that she was on notice that she was likely about to be early terminated. I mean, her probationary period was supposed to be six months. And after she made the- She terminated just short of, like a few days short of? I think it was two weeks about. But yes, just short of it. But nonetheless, it was prior to the end of the actual probationary period. But isn't that the whole purpose? I mean, as far as I understand Washington civil service law, you can terminate a probationary employee at any time up to six months before their, I'll call them rights under the employment agreement with the union become vested. Well, and you can also dismiss an at-will employee for any reason. But you can't dismiss them because they're Hispanic. I agree. So that's the difference. But you could dismiss them on day one if you thought that they just weren't going to cut it in this job. That's correct. That's absolutely correct. But you can't dismiss them. So what I'm asking you is how can I draw an adverse inference that a probationary employee was terminated five and a half months into their six month probationary period? Because the reason that she was terminated is because she was Hispanic and not because she was a probationary employee. What do we do with all that evidence that the employer offered about finding files in her work drawer at the bottom that basically were being overlooked and not adequately worked? It goes to the jury. I mean, again, that's a weighing of the evidence function. Because her assertion is. If that were the case, then we'd never grant summary judgment in a labor and employment action. If I'm looking at the McDonnell-Douglas burden shifting case, those cases are mostly summary judgment cases. And basically, in response to the employer's legitimate explanation for why they terminated her, the burden then shifts back to her to show that it was pretextual. Can you help us with what evidence she has to establish pretext? The most obvious evidence of pretext in this case is the timing between. And this comes from Ray versus Henderson and Bell versus Clackamas County. The timing between when her performance evaluations were considered adequate or perhaps there were some mildly critical remarks to when they suddenly became incredibly critical is very suspicious and raises an inference of pretext. That timing alone can suggest causation in terms of retaliation. In other words, any employer who wanted to fire an employee for discriminatory reasons could suddenly start creating a paper record, saying, oh, well, you messed up this and you screwed up that. And as the probationary employee, she is subject to quite frequent evaluations during that six-month period, is she not? Yes. And she had been reviewed, whatever, is every two weeks, every month, daily? I don't know. I think it was every month in the beginning and then it became more frequent after that, every couple of weeks. Counselor, you wanted to have four minutes for rebuttal on your initial plan. You have three minutes, 40 seconds. I see that. I'll save three minutes and I'll respond very quickly, which is just to say that if the evaluations had been critical all along, very critical all along, saying that she wasn't performing up to scratch, that would be one thing. But when you have a record where you have someone who is performing at least adequately, not such that you have very short one-page performance evaluations, suddenly they make a complaint about racial discrimination and all of a sudden you have, oh, this is the most inadequate employee that we've ever seen, it does raise the possibility of inference, particularly when you have also racially explicit remarks in the record. And I would distinguish this between cases where you don't have that. I will reserve the remainder of my time. Thank you. Okay, Ms. Clark. May it please the court, counsel. I am Marie Clark here representing the Department of Social and Health Services for the state of Washington. And as the court is well aware, we are down to now three Title VII claims in this case, and those are Ms. Diaz-Del-Castillo's hostile working environment claim and disparate treatment claim, both based on her national origin, and then the final claim, her retaliation claim. And I'd like to start by noting, as the district court did, that really nowhere in this record did Ms. Diaz-Del-Castillo specifically refute the evidence of her poor performance. That was not only the finding of the district court, but that was also the finding of the Equal Opportunity Commission, which investigated these claims initially. With regard to the retaliation claim first, I'd like to point out that you have an argument that somehow the temporal proximity between this complaint that was made in late October alone somehow gets Ms. Diaz-Del-Castillo to a jury trial. But the court found, and the record supports the court's finding, that temporal proximity alone will not create an inference of retaliation in every case. And this is such a case because we are, as the court points out, starting with a compressed chronology because we have a six-month probationary period. We have a federally funded program here with relatively high standards of competency that these probationers must meet by the end of that period. You also have, at the front end of that probationary period, a great number of classroom hours. So you have up to about 13-week in the program, pretty much trainees attending classroom the entire time. And so they're really not starting at the beginning with actual casework. That comes in progression. So by the time, and you have, as the court pointed out, the regular feedback at the regular standard intervals from the beginning until the end of Ms. Diaz-Del-Castillo's probation that all of the trainees would have had. And I don't agree with the characterization made by the appellant that somehow there was some sudden difference or change in tone regarding the feedbacks after she made her complaint in late October. If you look at the feedback form, there's a very much of a progression. And there are performance deficiencies that are creeping in well before this complaint that Ms. Diaz-Del-Castillo makes in late October. And many of those complaints and concerns, excuse me, deficiencies are mirrored in the later feedback forms. You will see a progression in length and more specificity, frankly, as the complex casework progresses and the employees are given more casework and caseload. So again, there were, there were really, and with regard to this, the performance feedback forms that are post the complaint, again, we have to look at the fact that Ms. Diaz-Del-Castillo never specifically refutes the specific delineated, articulated problems that are pointed out in very great detail by her supervisor and the trainer. So you have here in this case an issue of temporal proximity simply not carrying the day here. And even if Ms. Diaz-Del-Castillo then were able to show that there was some causal link here, again, the court found, assuming she could meet that threshold, she still couldn't provide the specific or substantial evidence of pretext. And that is her performance. We could to the, her hostile work environment argument. Taking the various facts, he listed it on Judge Callahan's questions that counsel said were the basis for that claim or the best evidence that she could think of to relate in the argument. You know, please give your view on whether all that is sufficient for a hostile work environment. We have to accept, I think, her version of the taco maker statement. We can't do it like the instructor was saying, don't do this. I understand, Your Honor. That's what she says. And the court below did give Ms. Diaz-Del-Castillo every benefit, the benefit of all reasonable inferences and still concluded, and I believe correctly so, that the conduct didn't rise to the level of severe or pervasive conduct. Much of the incidents didn't connote any, certainly didn't raise a reasonable inference that it was because of race as opposed to her being ill in class one day. And the court found that the harassment has to be, of course, as this court knows and has concluded as well, harassment that a reasonable person of Colombian heritage would find abusive. And that's that objective element that the court found was not met. And we attempted, I don't believe it's disputed evidence, but we did attempt to bring more context to Ms. Diaz-Del-Castillo's allegations by providing as part of the record her post-termination grievance as well as her EEOC complaint, which I think puts each of these incidents in greater context. And so, for example, with regard to the royalty comment, again, going back to Ms. Diaz-Del-Castillo's affidavit, many of the allegations are very conclusory and she comes to conclusions as to being ridiculed without stating why she believed so. And we did move to strike because I think that the court concluded as well that based on the admissible evidence and giving her every benefit, these were isolated comments. I believe the royalty comment made it introductions. If you go back and look at Ms. Diaz-Del-Castillo's own post-grievance, she is the one who indicated that it was of royal ancestry and that's what spurred the comment by the office chief during introductions that he did not know, apparently, that they had hired royalty. The taco maker example was twice, according to Ms. Diaz-Del-Castillo. We have only one incident that we know of where her supervisor stated to her that her accent was difficult. And again, if you go back and look at her post-grievance complaint and her, excuse me, and her EEOC complaint, she ties those two events together. The fact that she was complaining about the computer technician playing a game about not understanding her accent, at which point the supervisor then remarked that your accent is strong. So we have really one incident then of each of those. And we have apparently one incident where she is telling her subordinate that you don't have to speak in Spanish. We have paid interpreters. And that's directly from Ms. Diaz-Del-Castillo's affidavit. Not that she was told she could not, but that she was told she did not have to. And I think the SB situation is, I think, very clearly laid out that she invited staff to call her by that name. It's well-documented and I don't think she makes much of an issue of that. So again, we believe that this record, falls well short of establishing the elements of a hostile working environment claim based on this court's prior precedent. And with regard to the other non-racial conduct, as Ms. Diaz-Del-Castillo wants the court to address, the court below did address those as part of an overall hostile working environment claim and came to the same conclusion that there just wasn't a reasonable inference that this other conduct could be said to be on account of Ms. Diaz-Del-Castillo's race. And so the only other claim remaining, Your Honors, is the disparate treatment claim. And again, with regard to the termination, there really were, unless you go back to the hostile working environment claim, the very stray, isolated remarks, there's just no evidence that those comments were linked to the final decision maker who indicated that he took into account all of the evidence that he had, including that from the three medical consultants who were required to work with each of the probationers. And he came to the conclusion that it was his obligation to terminate Ms. Diaz-Del-Castillo as well as another non-Hispanic Caucasian employee, because they were not meeting the acceptable standards of competency by the end of their probationary period. Again, we have Ms. Diaz-Del-Castillo being started at a higher salary than most of the other probationers because she did have, according to her resume, 17 years earlier, some prior experience. She's replaced with a minority trainee and another Caucasian trainee. And we have evidence that we have another foreign-born trainee who succeeds in probation. Now, I know that they're not all Hispanic, but just to show that what is the reasonable inference that can be drawn from this record? And we concluded, and I believe the district court concluded that really a reasonable jury could not conclude, based on this record, that there was discriminatory animus toward Ms. Diaz-Del-Castillo, based upon her national origin. So, in conclusion, the state would respectfully request that the court affirm the trial court judgment, and unless there are any other questions. Seeing none, I accept the conclusion. I'd like to just take a step back for a moment and remind the court respectfully that it's seldom the case in a Title VII claim that you're going to have an employer who admits, yes, we are firing you because you made a complaint, or we are firing you because you're Hispanic. I think I can safely say I've never had anyone say that. What we're concerned about is whether the record viewed in the light, most favorable to your client, shows conduct so severe and pervasive as to qualify. Well, again, I'd like to also mention that that's not the only claim at issue here. There's also a retaliation claim and a disparate treatment claim, but I know you're concerned with the hostile work environment claim. There are some other examples, again, and all covered in the briefing, but I'll try to draw them out because the factual record, I know, is very important on this particular issue. There were instances in class where Ms. Diaz del Castillo would ask questions and was reprimanded for asking questions, and then when she stopped asking questions, she was reprimanded for not asking enough questions. There was an incident between her and her supervisor in which her supervisor essentially was concerned about her own supposedly discriminatory acts against her supervisor. There was just a great deal of hostile atmosphere, again, in a very short period of time that she spent there that was not directed at any of the other trainees. And while not every single incident was racially explicit, the racially explicit incidents do cast an inference on the other incidents and do raise a fact question as to whether or not those instances were also racially motivated. I'd like to point out that the district court did, in fact, disregard her other allegations of hostile treatment that were not racially explicit, citing ONCAL, saying that in ONCAL, Title VII is meant to be a discrimination and not, again, a civility lawsuit or a civility claim. But that disregards this notion raised in McInnis, that when you have specifically racially charged incidents, it casts a pallor over other kinds of incidents that may just be something like giving an employee the cold shoulder or not allowing the employee to take extended breaks when other employees are. Those sorts of incidents in and of themselves, and if that were the whole record, if you take out the racial comments and that's the whole record of hostile work environment, is just isolated incidents with a supervisor and yelling at her in front of other trainees and belittling her in front of other trainees, I would say maybe not, but that's not what we have here. We have a record of specific racially charged behavior and then an ongoing pattern of hostile treatment to her that certainly should be submitted to a jury. Thank you very much. OK. Thank you. Thank you both for your argument, and I note that you're pro bono counsel, and the court's always appreciative of counsel giving of their expertise and their resources to facilitate the court in deciding these difficult cases. So we thank Ms. Drive for her pro bono contribution, and we thank Ms. Clark for showing up and arguing also. And I'm sure you should be paid better than you are, so how's that? Everyone would agree to that. The Diaz case will be submitted, and we will adjourn for the day.
judges: Gould, Tallman, Callahan